UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
BOWLING GREEN DIVISION
CIVIL ACTION NO. 1:14-CV-00081-GNS-HBB

CHRISTOPHER BOLING                                                                                     PLAINTIFF

v.

PROSPECT FUNDING HOLDINGS, LLC                                                          DEFENDANT

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on Plaintiff's Renewed Motion for Summary Judgment (DN 45), Defendant's Cross-Motion for Summary Judgment (DN 56), and Defendant's Motion to Strike Plaintiff's Renewed Motion for Summary Judgment (DN 57). For the reasons outlined below, Plaintiff's motion is **GRANTED**, and Defendant's motions are **DENIED**.

### I.        STATEMENT OF FACTS AND CLAIMS

On May 23, 2008, Plaintiff Christopher Boling ("Boling") suffered severe burns when vapors escaping from a gas can ignited upon coming into contact with a hot metal eye bolt. (Am. Compl. ¶¶ 9-11, DN 7). As a result of his injuries, Boling and his then-wife filed suit against the gas can manufacturer, Blitz USA ("Blitz"), in this Court (*Boling v. Blitz USA, Inc.*, Civil Action No. 1:09-CV-00067-JHM-ERG).[1] During the course of their litigation against Blitz, the Bolings entered into a series of agreements (collectively "Agreements") with Prospect Funding Holdings,

---

[1] Under the terms of Boling's divorce settlement agreement, any recovery from his personal injury claim against Blitz was to be considered his non-marital property. (Pl.'s Counter Mot. Partial Summ. J. & Resp. Def.'s Mot. Dismiss, Ex. 5, DN 20-5).

LLC ("Prospect") and Cambridge Management Group, LLC ("CMG")[2] to borrow monies secured by Boling's prospective recovery from Blitz. (Compl. Exs. A-D, DN 1-1 to 1-4). The terms of the Agreements are summarized as follows:

| Date | Lender | Amount & Fees |
|---|---|---|
| October 2009 | CMG | $10,000.00 plus fees of $1,275.00 plus additional costs |
| March 2010 | CMG | $5,000.00 plus fees of $825.00 plus additional costs |
| May 2012 | Prospect | $5,000.00 plus fees of $1,025.00 plus additional costs |
| April 2013 | Prospect | $10,000.00 plus fees of $1,800.00 plus additional costs |

(Am. Compl. ¶¶ 14-31; Compl. Exs. A-D, DN 1 to 1-4). By their terms, the loans[3] were to accrue interest at a rate of 4.99% per month.[4] (Compl. Exs. A-D, DN 1 to 1-4).

On June 19, 2014, Boling filed this lawsuit against Prospect seeking a declaratory judgment that the Agreements are to be interpreted by and deemed unenforceable under Kentucky law. (Compl. ¶¶ 43, 45, DN 1). Subsequently, on September 4, 2014, Prospect filed

---

[2] Both Prospect and CMG are in the business of litigation funding. As one author has noted, "[l]itigation funding is a relatively new field. . . . In the absence of formal regulation of litigation funding by many states, courts have assessed the validity and enforceability of litigation funding agreements under a variety of legal theories." Robin Miller, Annotation, *Enforcement and Validity of Litigation Funding Agreements*, 72 A.L.R.6th 385 (2012). Prospect acquired the Agreements between Boling and CMG in 2013. (Compl. ¶ 32).

[3] Prospect has previously taken issue with the Court's characterization of these Agreements as non-recourse loans. (Def.'s Mem. Supp. Mot. Reconsideration 3-5, DN 34-1). As defined by *Black's Law Dictionary*, a loan is defined as the "[d]elivery by one party to and [the] receipt by another party of [the] sum of money upon agreement, express or implied, to repay it with or without interest." *Black's Law Dictionary* 936 (6th ed. 1990) (citation omitted). Whether the Agreements are characterized as loans, funding agreements, or advances, the more salient issue is how they work: a litigant receives a sum of money in return for the promise to repay that sum (at a substantial monthly rate of interest) from any recovery in his or her personal injury litigation. If the litigant recovers nothing, he or she has no obligation to repay.

[4] As of August 22, 2014, the total amount owed to Prospect was $340,405.00 on the original principal amounts totaling $30,000. (Compl. Ex. F, DN 1-6). The outstanding balance owed on the Agreements is approximately $1.5 million as of March 2017, based on the Court's calculation.

2

suit against the Bolings in the Superior Court of New Jersey, Chancery Division, which Boling removed to the U.S. District Court for the District of New Jersey. Both cases have since been consolidated in this Court. (Order, DN 35).

On September 25, 2015, the Court granted Boling's motion for partial summary judgment, and denied Prospect's motion to dismiss. (Mem. Op. & Order, DN 31). In granting Boling's motion, the Court held that this Court was a proper forum to hear the dispute and that Kentucky law would apply in addressing the enforceability of the Agreements. (Mem. Op. & Order 10-14). Following some discovery, both parties have filed the present motions.

## II. JURISDICTION

This Court has subject-matter jurisdiction of this matter based upon diversity jurisdiction. *See* 28 U.S.C. § 1332.

## III. STANDARD OF REVIEW

In ruling on a motion for summary judgment, the Court must determine whether there is any genuine issue of material fact that would preclude entry of judgment for the moving party as a matter of law. *See* Fed. R. Civ. P. 56(a). The moving party bears the initial burden of stating the basis for the motion and identifying evidence in the record that demonstrates an absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). If the moving party satisfies its burden, the non-moving party must then produce specific evidence proving the existence of a genuine issue of fact for trial. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

While the Court must view the evidence in the light most favorable to the non-moving party, the non-moving party must do more than merely show the existence of some "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,

475 U.S. 574, 586 (1986) (citation omitted). Rather, the non-moving party must present specific facts proving that a genuine factual issue exists by "citing to particular parts of the materials in the record" or by "showing that the materials cited do not establish the absence . . . of a genuine dispute." Fed. R. Civ. P. 56(c)(1). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson*, 477 U.S. at 252.

### IV. DISCUSSION

#### A. Plaintiff's Renewed Motion for Partial Summary Judgment

In his renewed motion, Boling seeks partial summary judgment challenging the validity of the Agreements on two bases. He argues that the Agreements: (i) violate Kentucky's prohibition on champerty and are void; and (ii) contain an interest rate that is usurious. (Pl.'s Mem. Supp. Mot. Summ. J. 2-17, DN 45-1).

##### 1. *Champerty*

In diversity actions, federal courts generally must apply state law in accordance with the decisions of the state's highest court. *See Ziegler v. IBP Hog Market, Inc.*, 249 F.3d 509, 517 (6th Cir. 2003) (internal citations omitted). In the present case, neither party has identified any specific pronouncement by Kentucky's highest court addressing whether agreements granting security interests in prospective tort claims would be enforceable under Kentucky law.

When evaluating an undecided question of Kentucky law, a federal court sitting in diversity must make "the best prediction, even in the absence of direct state precedent, of what the Kentucky Supreme Court would do if it were confronted with [the] question." *Combs v. Int'l Ins. Co.*, 354 F.3d 568, 577 (6th Cir. 2004) (quoting *Managed Healthcare Assocs., Inc., v. Kethan*, 209 F.3d 923, 927 (6th Cir. 2000)). In doing so, the Court looks to "the decisions (or

4

dicta) of the Kentucky Supreme Court in analogous cases, pronouncements from other Kentucky courts, restatements of law, commentaries, and decisions from other jurisdictions." *State Auto Prop. & Cas. Ins. Co. v. Hargis*, 785 F.3d 189, 195 (6th Cir. 2015) (internal citations omitted). Federal courts "must proceed with caution" when making such predictions. *Combs*, 354 F.3d at 577 (internal citations omitted).

Kentucky courts have long recognized the common law doctrine of champerty. *See Roberts v. Yancey*, 21 S.W. 1047, 1047 (Ky. 1893). As Kentucky's highest court has noted:

> At common law champerty is defined to be a bargain by the terms of which a person having otherwise no interest in the subject matter of an action undertakes to carry on the suit at his own expense or to aid in so doing in consideration of receiving, in the event of success, some part of the land, property or money recovered or deriving some benefit therefrom.

*Fordson Coal Co. v. Garrard*, 125 S.W.2d 977, 981 (Ky. 1939) (citing *Wilhoit's Adm'x v. Richardson*, 236 S.W. 1025 (Ky. 1921)). The defense of champerty is still viable under Kentucky law. *See Scott v. Davis*, Nos. 2013-SC-000228-DG & 2013-SC-000682-DG, 2015 WL 3631136, at *6 (Ky. June 11, 2015) (discussing the assignability of legal malpractice claims and the defense of champerty); *McCullar v. Credit Bureau Sys., Inc.*, 832 S.W.2d 886, 887 (Ky. 1992) (noting that champerty is a viable defense to contract claims). The Court must also consider as part of its analysis KRS 372.060, which provides:

> Any contract, agreement or conveyance made in consideration of services to be rendered in the prosecution or defense, or aiding in the prosecution or defense, in or out of court, of any suit, by any person not a party on record in the suit, whereby the thing sued for or in controversy or any part thereof, is to be taken, paid or received for such services or assistance, is void.

KRS 372.060. *See also Skinner v. Morrow*, 318 S.W.2d 419, 429 (Ky. 1958) (applying KRS 372.060 and invaliding an "heir-hunting" contract under which a company received an assignment of a partial interest in an estate); *Charles v. Phillips*, 252 S.W.2d 920, 921-22 (Ky.

5

1952) (setting aside a deed as champertous in violation of KRS 372.060 where it was given in consideration of sums advanced to prosecute a divorce action).

In *Incline Energy, LLC v. Stice*, No. 3:09-CV-58-H, 2009 WL 1975038 (W.D. Ky. July 6, 2009), this Court considered the enforceability of agreements similar to the present case in the context of a bankruptcy appeal. Noting the absence of any Kentucky state court decision addressing this issue, this Court stated:

> Courts that have examined the issue in depth have asked whether dividing the proceeds of a cause of action and the cause of action itself is a distinction without a difference, or whether meaningful differences between the two justify not applying the general rule that a person cannot assign causes of action for personal injuries. In Kentucky, personal injury causes of action are not assignable, because "a claim for personal injuries is peculiarly a personal right that the injured party may or may not assert as he pleases, and that to permit one's pain and suffering to become a matter of speculation is not looked upon with favor by the law." *Wittenauer v. Kaelin,* 228 Ky. 679, 15 S.W.2d 461, 462 (1929). While after an assignment of the proceeds of a lawsuit, unlike the assignment of a cause of action, an injured party may or may not assert his claims as he pleases, it still invites speculation on another's pain and suffering.

*Id.* at *2. In concluding the agreements violated Kentucky public policy, this Court explained:

> While there may well be a meaningful difference between assigning a cause of action and assigning the proceeds of the cause of action, the Court cannot confidently predict that the Kentucky Supreme Court would take the step to prohibit the former, but allow the latter. The Court concludes that the assignment of proceeds here still falls broadly within the public policy reasons why Kentucky prohibit[s] the assignment of causes of action. As such, the Court predicts that the Kentucky Supreme Court would prohibit such an assignment of the proceeds of causes of action.

*Id.* at *3. Since the *Stice* decision, it does not appear that any Kentucky state court has addressed the enforceability of these types of agreements.

As expressed in *Stice*, the Court is mindful of the important public policy against champerty that is implicated with litigation funding. As one court explained:

> [T]he ill effects of a contract that gives a stranger a contingent interest in the outcome of litigation go well beyond encouraging people to sue or direct control

6

> of the litigation. Such contracts should continue to be suspect because they create a disincentive to settle and because public policy does not encourage strangers profiting from the litigation of others.

*Prospect Funding Partners LLC v. Williams*, No. 27-CV-13-8745, 2014 Minn. Dist. LEXIS 2, at *21-22 (Minn. Dist. Ct. May 5, 2014). *See also Johnson v. Wright*, 682 N.W.2d 671, 678 (Minn. Ct. App. 2004) ("Through this agreement, respondent effectively intermeddled and speculated in appellant's litigation and its outcome. We conclude that because recovery is tied to the outcome of the litigation, the [] agreement is champertous."). The untoward impact on settlement from permitting assignment of claims proceeds is particularly concerning because of Kentucky's public policy favoring settlement of disputes. *See Wehr Constructors, Inc. v. Assurance Co. of Am.*, 384 S.W.3d 680, 689 (Ky. 2012) (noting that Kentucky has an "important public policy of encouraging settlements by the parties to a lawsuit by facilitating settlement agreements . . . ." (citations omitted)); *Lexington-Fayette Urban Cty. Gov't v. Lexington Herald-Leader Co.*, 941 S.W.2d 469, 472 (Ky. 1997) ("We recognize the important public policy served by those measures which encourage settlement . . . ." (internal quotation marks omitted) (citation omitted)); *Proctor v. Louisville & Nashville R. Co.*, 23 S.W. 736, 739 (Ky. 1921) (noting Kentucky's "wholesome, well-recognized public policy which encourages the settlement and compromise of disputes and controversies.").

These types of funding arrangements can permit third parties to influence the settlement decision-making process by removing or diluting control of the tort victim. Litigation funding also potentially discourages settlement because an injured party may be disinclined to accept a reasonable settlement offer where a large portion of the proceeds would go to the firm providing the loan. Under those circumstances, a plaintiff could feel compelled to try the case and ultimately run the risk of receiving no recovery for his or her injuries. Based on the reasoning

articulated in *Stice* and the potential adverse effects on settlement where an assignment of claims proceeds has been made, this Court believes that the Kentucky Supreme Court would conclude that the Agreements violate the doctrine of champerty and are void. *See Martello v. Santana*, 713 F.3d 309, 313 (6th Cir. 2013) (applying Kentucky law and stating that "[c]ourts may void contracts that violate law or public policy." (citations omitted)).

Prospect argues that it did not aid the prosecution of Boling's lawsuit so that its arrangement is not champertous. Instead, Prospect points out that the Agreements state that the funds advanced were for "the necessities of life or medical care" and thus did not aid Boling in the prosecution of his personal injury claim. (Compl. Ex. A, at 1). Given, however, that the Agreements further recognize the funds were needed so Boling would have "time to seek justice through the courts or negotiations", the money was explicitly intended to sustain Boling financially while he pursued Blitz. Thus, these loans unquestionably aided Boling's prosecution of his case. (Compl. Ex. A, at 1).

Prospect relies on *Abrams v. Fits*, No. C 76-0145 L(A), 1979 U.S. Dist. LEXIS 14990 (W.D. Ky. Jan. 18, 1979), in arguing that the Agreements should be enforced. (Def.'s Resp. Pl.'s Mot. Partial Summ. J. & Def.'s Cross-Mot. Summ. J. 11-12, DN 56). While Prospect misidentifies that decision as being from the Kentucky Court of Appeals, *Abrams* is a decision from this Court involving the issue of whether a federal tax lien trumped an assignment of the proceeds of a personal injury action. *See Abrams*, 1979 U.S. Dist. LEXIS 14990, at *1-2. The plaintiff and the federal government filed competing summary judgment motions, and the government questioned the validity of the assignment of the personal injury claim proceeds. *See id.* at *3. With little analysis, this Court concluded that assignments were permitted in some circumstances. *See id.* at *4-5. As this Court noted in *Stice*, however, there was no detailed

8

analysis in *Abrams* of whether the proceeds of a personal injury claim could be assigned and no discussion whatsoever of the applicability of champerty as a defense to that assignment. As recognized in *Stice*, the Court "has little history to work with in determining how Kentucky courts would address this issue." *Stice*, 2009 WL 1975038, at *2. *Abrams* provides no clarity on this point.

In opposing Boling's motion, Prospect raises additional arguments not addressed above in *Abrams* or *Stice*. It cites to other jurisdictions where such agreements are enforceable, the lack of legislative action by the Kentucky General Assembly, and the fact that that litigation funding has been discussed in Kentucky continuing legal education ("CLE") courses as evidence that such agreements are enforceable. (Def.'s Resp. Pl.'s Mot. Partial Summ. J. & Def.'s Cross-Mot. Summ. J. 3-8). Decisions from other states besides Kentucky which recognize the validity of these types of agreement are clearly not dispositive of this issue. Kentucky still recognizes the doctrine of champerty, and the reasoned decision in *Stice* explains why the Kentucky Supreme Court would likely reach the same conclusion.

Both parties have argued the significance of the General Assembly's lack of action on proposed legislation in 2010 which would have authorized and regulated litigation funding. The failure to pass the bill is of limited value because such inaction could be construed as supporting either party's position. *Compare Coslow v. Gen. Elec. Co.*, 877 S.W.2d 611, 614 (Ky. 1994) ("We believe we must interpret legislative inaction, in this instance, as legislative acquiescence. Due to the fact that the legislature has left unchanged the date-of-accident provision, and because the meaning and effect of that language has been defined and is well-settled, we can only conclude that in injury claims that are the result of a single traumatic event or accident, it is the legislative intent for the [statute of limitations] to run from the date of the accident." (internal

citation omitted)), *with Shawnee Telecom Res., Inc. v. Brown*, 354 S.W.3d 542, 560 (Ky. 2011) ("[L]egislative inaction [is] . . . a weak reed upon which to lean and a poor beacon to follow in construing a statute." (internal quotation marks omitted) (second alteration in original) (quoting *Brown v. Arp & Hammond Hardware Co.*, 141 P.3d 673, 684 (Wyo. 2006))). In this instance, it appears more likely that Kentucky's champerty statute, first enacted in 1942, coupled with the General Assembly's refusal to pass laws specifically permitting litigation funding reflect a rejection of the practice advanced by Prospect.

Prospect's reliance on discussions from CLE programs in support of the Agreements' validity is likewise misplaced. The content of CLE programs can vary depending upon the perspective of the presenter, and a lecturer's commentary on an unsettled question of law is of dubious value. One can certainly expect that a presentation on issues related to champerty would be decidedly different when offered from a lender's counsel versus a debtors' rights attorney. Law review articles and learned treatises may be influential to courts in deciding unanswered questions of law. Unattributed outlines from CLE programs?[5] Not so much.

In light of the undecided question of Kentucky law at issue, the Court concludes that the Kentucky Supreme Court would hold that the Agreements violate Kentucky public policy and the statute proscribing champerty for the reasons articulated in *Stice*. Because the Agreements are therefore void, the Court will grant summary judgment in favor of Boling on this basis.

### 2. *Usury*

Boling also seeks summary judgment on the ground that the interest rates provided for in the Agreements violate Kentucky's usury laws. Having held that the Agreements are champertous, the Court will nevertheless consider this issue.

---

[5] The link provided by Defendant is no longer functioning, so the Court is unable to review the referenced CLE materials.

> In relevant part, KRS 360.010 provides:
>
> The legal rate of interest is eight percent (8%) per annum, but any party or parties may agree, in writing, for the payment of interest in excess of that rate as follows: [] at a per annum rate not to exceed four percent (4%) in excess of the discount rate on ninety (90) day commercial paper in effect at the Federal Reserve Bank in the Federal Reserve District where the transaction is consummated or nineteen percent (19%), whichever is less, on money due or to become due upon any contract or other obligation in writing where the original principal amount is fifteen thousand dollars ($15,000) or less . . . ; and any such party or parties, and any party or parties who may assume or guarantee any such contract or obligation, shall be bound for such rate of interest as is expressed in any such contract, obligation, assumption, or guaranty, and no law of this state prescribing or limiting interest rates shall apply to any such agreement or to any charges which pertain thereto or in connection therewith . . . .

KRS 360.010(1). *See also Unified CCR Partners v. Harrell*, No. 2015-SC-000117-DG, 2017 WL 635564, at *3 (Ky. Feb. 16, 2017) ("KRS 360.010(1) does not create an entitlement to statutory interest, rather, it sets a default interest rate in the absence of a contractually agreed upon interest rate."); *Gudgel v. Kaelin*, 551 S.W.2d 803, 805-06 (Ky. App. 1977) (holding that a borrower cannot waive a usury statute intended to protect the public).

In this case, the terms of each Agreement provided that the Bolings received a sum of money less than $15,000, which accrued interest at a rate of 4.99% per month.[6] During the term of the Agreements, the 90-day commercial paper discount rate at the Federal Reserve Bank in the relevant district has hovered far below 1%. *See* Bd. of Governors of Fed. Reserve Sys., Fed. Reserve Bank of St. Louis, *90-Day AA Financial Commercial Paper Interest Rate [RIFSPPFAAD90NB]*, https://fred.stlouisfed.org/series/RIFSPPFAAD90NB (last visited Mar. 15, 2017). Thus, under the statute, the maximum rate of interest permitted was the lower of roughly 5% (4% + less than 1%) or 19%, or somewhere below 5% per annum. In stark contrast, the Agreements provided for a rate of interest of 4.99% per **month**, in clear violation of KRS

---

[6] Because the Agreements call for interest to be compounded monthly, the effective annual rate of interest would be 79.38%.

360.010(1). The civil penalty for violating KRS 360.010 includes forfeiture of any interest owed, so that Prospect can exact no interest from Boling under its usurious contracts. *See* KRS 360.020(1); *see also Tyler v. DH Capital Mgmt.*, 736 F.3d 455, 464 (6th Cir. 2013) ("The interest need not have been collected; the statute can be used to 'invalidate[] contracts to the extent they are usurious.'" (alteration in original) (quoting *E'Town Shopping Ctr., Inc. v. Lexington Fin. Co.*, 436 S.W.2d 267, 269 (Ky. 1969))).

Prospect argues that KRS 360.010 is inapplicable because the Agreements are not loans.[7] (Def.'s Resp. Pl.'s Mot. Partial Summ. J. & Def.'s Cross-Mot. Summ. J. 16). By its language, however, KRS 360.010(1) is not limited to loans. The statute never uses the term "loan" in that subsection; rather it applies to "any contract or other obligation in writing where the original principal amount is fifteen thousand dollars ($15,000) or less . . . ." KRS 360.010(1)(a). The scope of KRS 360.010(1) certainly encompasses the subject Agreements, each of which evidence indebtedness under $15,000. *See Grace v. LVNV Funding, Inc.*, 22 F. Supp. 3d 700, 703 (W.D. Ky. 2014) ("[KRS 360.010 is [a statute] of general applicability, designed to protect consumers from usurious rates in consumer contracts. Unlike some states' usury laws, Kentucky does not limit the types of transactions covered by its statute. The interest cap stated in KRS § 360.010 explicitly applies to 'any contract or other obligation . . . .'" (internal footnote omitted)).

Prospect claims that because repayment under the Agreements was contingent upon Boling's recovery, the defense of usury does not apply. (Def.'s Resp. Pl.'s Mot. Partial Summ. J. & Def.'s Cross-Mot. Summ. J. 17-18). In support of this argument, Prospect relies on the decision of Kentucky's highest court in *Dublin v. Veal*, 341 S.W.2d 776 (Ky. 1960). In *Dublin*, two businessmen were engaged in an ongoing business to sell and finance automobiles. *See id.*

---

[7] Based on the *Black's Law Dictionary*'s definition of a loan quoted in footnote 3, it is difficult to see the distinction between the Agreement terms and a loan.

at 777. To memorialize that relationship, each year they entered into a promissory note under which no interest rate was provided but Dublin agreed to pay his co-partner a percentage of the business profits. *See id.* After suit was brought against Dublin on one such note, he argued that co-partner's recovery of profits under the note was barred by the defense of usury. *See id.* Kentucky's highest court disagreed, however, reasoning that the agreement was not usurious because repayments under the promissory note were entirely based on profits from the parties' ongoing commercial enterprise. *See id.* at 777-78.

The Agreements at issue here expressly impose an interest rate which blatantly violates the usury statute and stands in stark contrast to Dublin's note which contained no provision for interest. Further, unlike *Dublin*, there was no commercial enterprise or partnership between Prospect and Boling; Boling was not engaged in any business, and Prospect simply loaned him money to tide him over while he litigated his personal injury claim.

Here, there is no question that Prospect charges interest on the funds advanced to Boling. The face of each Agreement provides for an interest rate of 4.99% per month, which is compounded every month to yield an annual effective interest rate of nearly 80%. Because the interest rate provided for in the Agreements violates KRS 360.010(1), the Court will also grant summary judgment for Boling on this basis.

### 3. *Incomplete Discovery*

Prospect opposes Boling's motion, in part, because discovery has not yet been completed. (Def.'s Resp. Pl.'s Mot. Partial Summ. J. & Def.'s Cross-Mot. Summ. J. 2). None of the factual disputes or additional discovery identified by Prospect, however, would have any bearing on the issues of champerty or usury. (Def.'s Resp. Pl.'s Mot. Partial Summ. J. & Def.'s Cross-Mot. Summ. J. Exs. 6-7, DN 56-6 to 56-7). Because Boling's motion involves purely legal issues

13

regarding which there are no material factual issues, additional discovery would not impact the Court's ruling.

### B. Defendant's Cross-Motion for Summary Judgment

Prospect has also moved for summary judgment and argues: (i) the Agreements are enforceable under Kentucky law, (ii) Boling breached the terms of the Agreement by failing to repay the amounts owed; (iii) a ruling that the Agreements are unenforceable would be judicial activism.[8] (Def.'s Resp. Pl.'s Mot. Partial Summ. J. & Def.'s Cross-Mot. Summ. J. 21-25). In addressing Boling's summary judgment motion, the Court has rejected Prospect's argument that the Agreements are enforceable and as a result Prospect is not entitled to enforce those void agreements as a matter of law. A void agreement cannot be enforced and Boling therefore cannot be found in breach of the Agreements. *See Dobbs v. Holder*, 242 S.W.2d 605, 607 (Ky. 1951) ("The almost universal rule regarding [void] contracts . . . is that they are void and may not be enforced . . . ." (internal quotation marks omitted) (citation omitted)).

The Court also rejects Prospect's characterization of a ruling invalidating the Agreements as constituting judicial activism. It is this Court's duty to apply Kentucky law when sitting in diversity and in the absence of authority on a legal issue the Court is required to predict how the Kentucky Supreme Court would rule if presented with that issue. *See Combs*, 354 F.3d at 577. With no Kentucky state court decision on the champerty issue, this Court's prior ruling in *Stice* guides the holding in the present case. The fact that Prospect may strongly disagree with the Court's decision does not render such ruling a product of judicial activism.

---

[8] While Prospect has not characterized its motion as being a motion for partial summary judgment, several of its counterclaims are not addressed in the motion, and the Court will treat the motion as seeking only partial summary judgment on the claims addressed.

14

For these reasons, Prospect has failed to show that it is entitled to summary judgment as a matter of law. The Court will therefore deny Prospect's motion.

### C. <u>Defendant's Motion to Strike</u>

In Defendant's Motion to Strike, it raises various objections to the renewed motion for summary judgment. In its motion, Prospect argues that Boling's summary judgment motion violates Fed. R. Civ. P. 56(c)(1)(A). The Agreements are in the record and were attached as Exhibits A through D to the Complaint. The facts are largely undisputed by the parties: the Agreements assign to Prospect an interest in the proceeds of Boling's product liability claim and provide an interest rate of 4.99% per month on the advanced sums. The only issue is a legal one: whether those Agreements are enforceable under Kentucky law. Thus, the motion to strike is not well-taken. While courts generally have the inherent power to control their dockets and strike documents, this Court agrees with a sister court's apt characterization of such motions: "[m]otions to strike are generally viewed with disfavor and are 'often considered time wasters.'" *TracFone Wireless, Inc. v. Zip Wireless Prods., Inc.*, 716 F. Supp. 2d 1275, 1290 (N.D. Ga. 2010) (citation omitted). Because the Boling's motion was proper, Defendant's motion will be denied.

## V. CONCLUSION

For the foregoing reasons, **IT IS HEREBY ORDERED** that Plaintiff's Renewed Motion for Partial Summary Judgment (DN 45) is **GRANTED**; Defendant's Cross-Motion for Summary Judgment (DN 56) is **DENIED**; and Defendant's Motion to Strike Plaintiff's Renewed Motion for Summary Judgment (DN 57) is **DENIED**. Defendant's counterclaims of unjust enrichment, promissory estoppel, breach of the duty of good faith and fair dealing, negligent misrepresentation, and conversion are still pending.

**Greg N. Stivers, Judge**
**United States District Court**
March 30, 2017

cc: counsel of record